IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID CREWS,                    :
                                :
            Plaintiff,          :           CIVIL NO. 4:07-CV-2217
                                :
      v.                        :           Hon. John E. Jones III
                                :
DOCTOR BEAVEN, *et al.*,         :
                                :
            Defendants.         :

## MEMORANDUM

September 10, 2010

## THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:

On December 6, 2007, Plaintiff David Crews ("Plaintiff" or "Crews"), an

inmate presently confined at the Dallas State Correctional Institution ("SCI Dallas") in

Dallas, Pennsylvania, initiated the above civil rights action *pro se* by filing a

Complaint under the provisions of 42 U.S.C. § 1983.  (Doc. 1.)  By Order dated

January 22, 2008, a second civil rights Complaint filed by Crews at Civil No. 4:08-

CV-0081 (Doc. 9), in which he makes essentially the same allegations, and identifies

the doctor he referred to as a "John Doe" in his first Complaint as Dr. Gadea, was

consolidated with this action.  (Doc. 10.)

Plaintiff's claims stem from events that occurred while he was incarcerated at

the Camp Hill State Correctional Institution ("SCI Camp Hill") in Camp Hill,

Pennsylvania. He names the following employees of SCI Camp Hill as Defendants: Corrections Officers Joseph S. Klepacz, Kevin S. Mains, Jr., and David B. Crozier ("Corrections Defendants"); and Barry Beaven, M.D. and Ramon Gadea, M.D. ("Medical Defendants").

A detailed recitation of the allegations of Plaintiff's Complaint may be found in our March 17, 2009 Order disposing of a Motion to Dismiss filed on behalf of Defendants Beaven and Gadea. (*See* Doc. 40 at 3-5.) However, to summarize, Crews alleges that Defendants Klepacz, Mains, and Crozier denied him medication in violation of the cruel and unusual punishment clause of the Eighth Amendment, and that their denial of medication after he filed a grievance constituted retaliation in violation of the First Amendment. (*See* Doc. 1 at 8.) He further alleges that Dr. Beaven disclosed confidential medical information in violation of the Fourth and Fourteenth Amendments (*see* Doc. 1 at 7 ¶ 12), and that Dr. Gadea refused to give him his medication in violation of the Eighth Amendment (*see* Doc. 9 ¶ IV(C).)

Presently before the Court are Motions for Summary Judgment filed on behalf of Medical Defendants (Doc. 79) and Corrections Defendants (Doc. 82). For the reasons set forth below, the Motions will be granted.

2

**PROCEDURAL BACKGROUND**

Following the consolidation of the instant action with the action filed at Civil No. 4:08-CV-0081, by Order dated January 29, 2008, service of the consolidated Complaints (Docs. 1, 9) was directed. (Doc. 11.) On March 14, 2008, a Motion to Dismiss the Complaint was filed on behalf of the Medical Defendants. (Doc. 15.) By Order dated March 17, 2009, the Motion was granted in part and denied in part. (Doc. 40.) Specifically, Plaintiff's Fourth Amendment claim and request for compensatory damages arising out of his Fourteenth Amendment claim were dismissed with prejudice. (*See id.* at 13.) However, Plaintiff's Eighth Amendment claim against Dr. Gadea, Fourteenth Amendment claim against Dr. Beaven, and requests for nominal and punitive damages were allowed to proceed. (*See id.*) On March 27, 2009, Defendants Beaven and Gadea filed Answers to the Complaint. (Docs. 42, 43.)

Following the establishment of case management deadlines, and the subsequent extension of the dispositive motions deadlines, on September 17, 2009, a Motion for Summary Judgment was filed on behalf of Medical Defendants. (Doc. 79.) A Statement of Material Facts (Doc. 80), supporting exhibits (Docs. 80-2 through 80-15); and a supporting brief (Doc. 81) also were filed.

On September 24, 2009, a Motion for Summary Judgment was filed on behalf

of Corrections Defendants. (Doc. 82.) A supporting brief (Doc. 83), Statement of Material Facts (Doc. 84), and Appendices (Docs. 85, 86) also were filed.

In an Order dated December 22, 2009, we granted Plaintiff's first request for an extension of time to file his opposition to the pending Motions. (Doc. 88.) Plaintiff subsequently requested two (2) additional extensions of time in Motions filed on February 8, 2010 (Doc. 92) and March 29, 2010 (Doc. 95), which were granted. However, Plaintiff's fourth request for an extension of time (Doc. 97), filed on April 23, 2010, was denied, and by Order dated April 26, 2010, and he was directed to file his opposition to the pending Motions for Summary Judgment, including an opposing brief and statement of material facts as required by M.D. Pa. LR 56.1, on or before May 5, 2010. (*See* Doc. 98.)

Thereafter, Crews filed his opposition to Medical Defendants' Motion, including an opposition brief (Doc. 105), a response to Medical Defendants' Statement of Material Facts (Doc. 106), and supporting exhibits (Docs. 106-2 through 106-6). Medical Defendants have filed a reply brief.[1] (Doc. 108.)

In opposition to Corrections Defendants' Motion, Crews filed an opposition

---

[1] Medical Defendants style their reply brief as a "supplemental brief" and refer therein to a previously filed reply brief; however, no previous reply brief by Medical Defendants is on the docket.

brief (Doc. 101), a Statement of Material Facts (Doc. 102 at 1-3), and supporting

exhibits (Doc. 102 at 4-62). Accordingly, the Motions are fully briefed and ripe for

disposition.

**STANDARD OF REVIEW**

Summary judgment is appropriate if the record establishes "that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(c). Initially, the moving party bears the burden of

demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986). The movant meets this burden by pointing to an

absence of evidence supporting an essential element as to which the non-moving party

will bear the burden of proof at trial. *Id.* at 325. Once the moving party meets its

burden, the burden then shifts to the non-moving party to show that there is a genuine

issue for trial. Fed. R. Civ. P. 56(e)(2). An issue is "genuine" only if there is a

sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and

a factual dispute is "material" only if it might affect the outcome of the action under

the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on

allegations or denials in its own pleadings; rather, its response must . . . set out

specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985). However, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the non-moving party. *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48.

**STATEMENT OF MATERIAL FACTS**

Before reciting the facts material to the resolution of the instant Motions, we

6

observe that Crews filed a Statement of Material Facts directly responding to the

numbered paragraphs set forth in Medical Defendants' Statement, as required by

Middle District of Pennsylvania Local Rule ("LR") 56.1.[2] (*See* Doc. 106.)  However,

Medical Defendants correctly observe in their reply brief (Doc. 108) that the Statement

violates LR 56.1 in many instances in that Crews offers general denials and/or fails to

cite to the portions of the record that support his statements.  Nevertheless, in many

other instances, Crews does explain his denials and provides citations to the record to

support them.  Therefore, we decline to deem all of the facts in Medical Defendants'

Statement to be admitted, but instead, in light of Plaintiff's *pro se* status, and the fact

that he is the non-moving party, have reviewed the facts he has submitted that are in

compliance with LR 56.1 to determine whether he has succeeded in showing that there

---

[2]LR 56.1 provides, in pertinent part, as follows:

> The papers opposing a motion for summary judgment shall include a
> **separate**, short and concise statement of the material facts, responding to the
> numbered paragraphs set forth in the statement required in the foregoing paragraph,
> as to which it is contended that there exists a genuine issue to be tried.
> Statements of material facts in support of, or in opposition to, a motion [for
> summary judgment] **shall include references to the parts of the record that
> support the statements.** All material facts set forth in the statement required to be
> served by the moving party will be deemed to be admitted unless controverted by the
> statement required to be served by the opposing party.

LR 56.1 (emphasis added).  Plaintiff was provided with a copy of LR 56.1 along with the Standing
Practice Order issued in this case (*see* Doc. 4), and the Court referred him to the rule in directing
him to file his opposition to the instant Motions (*see* Docs. 88, 94, 96, 98).

7

are any genuine issues of material fact.

Plaintiff's Statement of Material Facts submitted in opposition to the Corrections Defendants' Motion also fails to fully comply with LR 56.1. (*See* Doc. 102.) Plaintiff's failure to comply is even more obvious in that the paragraphs in his Statement do not correspond to the numbered paragraphs in Corrections Defendants' Statement, and Plaintiff fails to specify whether he admits or denies each of Defendants' facts. (*See id.*) Despite these defects, upon careful review, it is apparent that many of the paragraphs in Plaintiff's Statement contain responses in which he disputes statements of fact by Corrections Defendants'. In many instances, Plaintiff also cites to portions of the record to support his statements. Therefore, again, in light of his *pro se* status, we have reviewed the facts he has submitted that are in compliance with LR 56.1 to determine whether he has succeeded in showing that there are any genuine issues of material fact.

We now present the following statement of facts material to the disposition of the instant Motions:

## I.      FACTS RELATING TO CLAIMS AGAINST CORRECTIONS DEFENDANTS

At all times material hereto, Crews was an inmate at SCI Camp Hill, where he

was confined within the Special Management Unit ("SMU"). (Doc. 84, Corrections Dfts. Statement of Material Facts ("SMF"), ¶ 1; Doc. 102, Pltf. SMF, ¶ 1.) At all times relevant hereto, the Corrections Defendants were employed by the Pennsylvania Department of Corrections ("DOC") as Corrections Officers at SCI Camp Hill. (Doc. 84 ¶ 2; Doc. 102 ¶ 2.)

### A. Defendant Klepacz

In his Complaint, Plaintiff alleges that, on July 31, 2007, Defendant Klepacz came up to Plaintiff's cell with a nurse who was administering medication to inmates and stated, "He's not ready, he doesn't have his jumpsuit on. (Doc. 84 ¶ 3; Doc. 102 ¶ 3.) According to Plaintiff's allegations, Klepacz also stated, "I don't care if you die Crews." (Doc. 84 ¶ 4; Doc. 102 ¶ 3.) Klepacz has sworn under penalty of perjury that when he arrived at Plaintiff's cell on July 31, 2007, Plaintiff was not wearing his jumpsuit. (Doc. 85 at 5, Klepacz Decl., ¶ 6.) Crews admitted in Grievance No. 195654, and admits in his Statement of Material Facts responding to Medical Defendants' Statement, that he was not wearing his jumpsuit on July 31, 2007, and the officer instructed the nurse not to give him his medications. (Doc. 80, Medical Dfts. SMF, ¶ 12; Doc. 106, Pltf. SMF Responding to Medical Dfts. SMF, ¶ 12; Doc. 80-6, Grievance No. 195654, at 2.)

In his dealings with Plaintiff on July 31, 2007, Klepacz followed Department policy and procedure. (Doc. 85, Klepacz Decl., ¶ 7.) That policy and procedure is set forth in the inmate handbook for SMU inmates that was in effect at the relevant time, which provides as follows: "The Medical Staff will distribute Medication on their daily visit. If you need medication, you must be standing at your cell door with the light on and fully dressed." (Doc. 85 at 8, Excerpt from SMU Inmate Handbook, ¶ 18.) Additional policy and procedure is contained in an e-mail from SCI Camp Hill Nursing Supervisor Janeen Davis, in which sets forth procedures for dispensing medications, and specifies that it is imperative that nurses and security staff remain compliant with the procedures. (Doc. 85 at 5, Klepacz Decl., ¶ 9.) This e-mail, which was posted in the SMU Control Booth, includes the following directives: "If the light is off, or the inmate is still in bed, or the inmate is unclothed or acting inappropriately, this is considered a refusal. The inmate must be informed that his behavior or disregard for policy and procedure is considered a refusal of medication." (*Id.* ¶ 10; Doc. 85 at 9, Copy of Davis E-mail.)

In his Complaint, Plaintiff also alleges that, on August 1, 2007, Klepacz again came to his cell with a medication nurse and said, "Crews refused his medication." (Doc. 84, Corrections Dfts. SMF, ¶ 11; Doc. 102, Pltf. SMF, ¶ 4.) Plaintiff disputes

that he refused his medication. (Doc. 102 ¶ 4.) Klepacz declares under penalty of perjury that he did not provide the security escort to the medication nurse on August 1, 2007, and he therefore did not make the statement Plaintiff claims he made on that date. (Doc. 85 at 5, Klepacz Decl., ¶ 11.)

### B. Defendant Mains

Plaintiff also alleges in his Complaint that, on August 2, 2007, Defendant Mains accompanied a nurse to his cell and said, "Crews doesn't want his medication," and that on August 3, 2007, Mains again came to his cell with a nurse who was dispensing medication and said, "Crews refused." (Doc. 84 ¶ 13; Doc. 102 ¶ 5.) Defendant Mains has no specific recollection of passing Plaintiff's cell on either August 2, 2007 or August 3, 2007. (Doc. 20, Answer, ¶¶ 10-11.) However, he has sworn under penalty of perjury that, if he were to have made the statements Plaintiff claims he made, they would have been in compliance with Department policy and procedure. (Doc. 85 at 12, Mains Decl., ¶ 5.) In particular, Mains declares that Crews was not given medication because he refused to comply with DOC policy mandating that all SMU inmates be properly dressed before they can be given their medications. (*Id.* ¶ 7.) On the occasions when Crews was not dispensed medication, it was because he did not have his jumpsuit on and refused all orders to get dressed. (*Id.* ¶ 8.)

## C.     Defendant Crozier

Plaintiff also alleges that, on August 4, 2007, Defendant Crozier accompanied a medication nurse to his cell and stated, "I don't care about your grievance and I hope you die nigger," and refused to give Plaintiff his medication.  (Doc. 84 ¶ 18; Doc. 102 ¶ 7.)  Crozier has sworn under penalty of perjury that he has never made any such statement.  (Doc. 85 at 14, Crozier Decl., ¶ 4.)  Plaintiff alleges that, the next day, August 5, 2007, Crozier again accompanied the medication nurse to his cell and stated, "Your grievances don't mean nothing we're going to see to it you die like inmate Prince," and once again refused to give Plaintiff his medication.  (Doc. 84 ¶ 20; Doc. 102 ¶ 9.)  Crozier has sworn under penalty of perjury that he has never made any such statement.  (Doc. 85 at 14 ¶ 6.)

Corrections officers do not administer medications to inmates; rather, medication is administered by nurses.  (*Id.* ¶ 7.)  Plaintiff does not dispute that nurses actually administer the medication; however, he observes that, in order for nurses to give medication to inmates, corrections officers must open the cell door slot.  (Doc. 102 ¶ 11.)  Crozier declares under penalty of perjury that Plaintiff was not given medication because he did not have his jumpsuit on, and therefore was in violation of DOC policy. (Doc. 85 at 14 ¶ 8.)  When he was asked to comply with the policy, Plaintiff refused to

get dressed and to be at his cell door with the light on. (*Id.* ¶ 10.) On any occasion upon which Plaintiff was not given medications by any nurse Defendant Crozier escorted, Plaintiff did not receive medication because he was not fully dressed and/or had not followed other provisions of the SMU Inmate Handbook. (*Id.* ¶ 11.)

### D. Plaintiff's Medical Records

Plaintiff's medical records for the time period during which the events giving rise to his claims against the Corrections Defendants occurred reflect as follows:

On July 31, 2007, Crews was at his cell door refusing to get dressed as ordered by the Corrections Officer for that morning's medication administration. (Doc. 80-10 at 7, Crews' Progress Notes, 7/31/07 Entry.) His refusal to get dressed was documented as a refusal of medication, he was warned that the refusal of medication may compromise his health, and a note was made that his chart would be shown to "MD"[3]. (*Id.*)

On August 1, 2007, Crews again stood at his cell door refusing to put his jumpsuit on to receive medications even though he was ordered to get dressed by the Corrections Officer. (*Id.*, 8/1/07 Entry) On that date, a notation was made that Crews became verbally abusive, stating, "There is no fucking policy like that you just won't

---

[3]It is unclear whether "MD"as used in Crews' medical records refers to "Medical Doctor" or "Medical Director."

give me my medications." (*Id.*) The medication refusal was documented, Crews was warned of the possibility of immunodeficiency as a result of his refusal, and the nurse noted that the issue would be referred to Dr. Miller and the infection control nurse. (*Id.*)

On August 2, 2007, Crews again refused to put his jumpsuit on during the morning medication administration, and again became verbally abusive after a corrections officer ordered him to get dressed. (*Id.*, 8/2/07 Entry.) He again was counseled as to the consequences of refusing his medication. (*Id.*)

On August 2, medical staff placed a telephone call to Dr. Gadea about Crews' refusal of HIV medications in the morning for the past three (3) days. (*Id.* at 8, 8/2/07 Entry.) The notes from that telephone call reflect that Gadea directed that Crews be scheduled for the next telemedicine clinic on August 15, 2007. (*Id.*)

Later in the day on August 2, Dr. Beaven made a note in Crews' medical records that Crews had refused medication three (3) times and had been " very abusive." (*Id.*, 8/2/07 Beaven Entry.)

On August 6, 2007, Crews again refused his medication. (*Id.*, 8/6/07 Entry.) On that occasion, Crews stood up against his cell door so that it was not possible to see if he had his jumpsuit on or off. (*Id.*) When a corrections officer ordered him to step

back and get fully dressed, Crews again became verbally abusive. (*Id.*) His medication refusal was documented, he was warned of the risks of refusing his medication, and his chart was given to Dr. Miller for review. (*Id.*)

On August 9, 2007, Crews refused to leave his cell to go to the medical cell for the chronic care clinic. (*Id.*, 8/9/07 Entry.)

On September 1, 2007, a note was made in Crews' medical records that medical staff were unable to do a health appraisal of Crews because he kept spitting on the staff members. (*Id.* at 11, 9/1/07 Entry.) A note was made that staff would try again on Wednesday or Thursday. (*Id.*) Crews' medical records reflect that on September 6, 2007 when he was approached for a possible health appraisal, he refused the exam. (*Id.*, 9/6/07 Entry.)

## II. FACTS RELATING TO CLAIMS AGAINST MEDICAL DEFENDANTS

### A. Doctor Beaven

Crews has made the following allegations against Doctor Beaven:

Defendant Beaven came to Crews' cell on an unspecified date and asked him in a loud voice why he was not taking his HIV medication. (Doc. 80, Medical Dfts. SMF, ¶ 9 (citing Doc. 1, Complaint, at ¶ 12).) Beaven attempted to humiliate him by broadcasting his medical condition to the entire tier where Crews was housed. (Doc.

106, Pltf. SMF, ¶ 9 (citing Doc. 1 at ¶ 13).)

Beaven has sworn under the penalty of perjury that, on August 2, 2007, he was informed that Crews had refused his medication on July 31, August 1, and August 2, 2007, and that he went to Crews' cell to try to convince him to obey the rules in order to receive his medication. (Doc. 80-13, Beaven V.S., ¶¶ 4-6.) On August 2, Beaven spoke to Crews at his cell, and when he informed Crews that he needed to take his medication, Crews became verbally abusive. (*Id.* ¶ 7.) Beaven recorded this encounter in Crews' medical notes. (*See* Doc. 80-10 at 8, 8/2/07 Beaven Entry.) Beaven verifies that he never announced in a loud voice that Crews had HIV and needed HIV medications. (Doc. 80-13 ¶ 8.) Beaven explains that Crews was housed in the SMU, and for security reasons, medication distribution and sick call is conducted at the cell door. (*Id.* ¶ 9.) Beaven verifies that he never violated SMU policies and/or procedures or Crews' privacy.[4] (*Id.* ¶ 10.) He verifies that the need to instruct Crews to take his HIV medication was within the standard of care, and that the treatment Crews received not only within the standard of care, but was appropriate and beneficial to him. (*Id.* ¶¶

---

[4] Chris Chambers, who was the SMU Unit Manager during the relevant time period, also has verified that psychological, psychiatric, and medical visits to SMU inmates are conducted at the cell door for security purposes because members of the medical staff are not trained in the same way as correctional officers to deal with an inmate threat to their safety. (Doc. 108-2, Chambers Decl., ¶ 20.)

11-14.)

### B.    Doctor Gadea

Crews has alleged as follows with regard to Defendant Gadea:

Sometime in September 2007, Defendant Gadea told Plaintiff that he needed additional blood and urine testing to determine whether his HIV medication was causing kidney problems. (Doc. 80 ¶ 10 (citing Doc. 9, Consolidated Complaint, at 3 ¶ IV C.)  In order to perform this evaluation, the HIV medication needed to be stopped for thirty (30) days. (*Id.*)  The medication was to be re-started in thirty (30) days, but did not timely resume. (*Id.*)  Gadea also allegedly told Plaintiff that because he was giving the SMU guards problems, if he was good, he would receive treatment. (*Id.*; Doc. 106 ¶ 10.)

In contrast to Crews' allegations, his medical records reflect that, on September 19, 2007, after Dr. Gadea examined him at the ID telemedicine clinic, he recommended stopping the HIV medications for *at least* thirty (30) days and ordered more tests. (Doc. 80-10 at 11, 9/19/07 Entry.)  Gadea explained Crews' lab results and the medication stoppage, and Crews verbalized his understanding and agreement. (*Id.*) Accordingly, on that date, Dr. Gadea directed the discontinuation of Retour, Epiuir, and Crixivan for thirty (30) days. (*Id.* at 31, Physician's Orders.)

17

Crews' Progress Notes indicate that on October 17, 2007, he was scheduled again for ID telemedicine clinic, but that Lieutenant Krieder came to the telemedicine room to discuss with Dr. Gadea that Crews had been acting out, and it was decided that the inmate presented a security risk, and thus Gadea would defer seeing Crews until November or December 2007. (*Id.* at 16, 10/17/07 Entry.) Therefore, the notes indicate that Dr. Gadea reviewed Crews' labs, and thereafter ordered that Retour, Epiuir, and Crixivan remain discontinued. (*Id.* at 18, 10/17/07 Gadea Entry; *Id.* at 32, Physician's Orders.)

On November 8, 2007, after Crews complained of headaches, cold sweats, chest pain, rapid heart rate, and shortness of breath, he was scheduled for ID telemedicine clinic on November 14, 2007. (*Id.* at 19, 11/5/07, 11/8/07 Entries.) On November 14, 2007, Crews refused to attend the ID telemedicine clinic. (*Id.*, 11/14/07 Entry.)

On November 21, 2007, Crews requested that his HIV medications be re-started. (*Id.*, 11/21/07 Entry.) He was seen and treated at sick call on November 30, 2007. (*Id.* at 20, 11/30/07 Entry.) He then was seen on December 19, 2007 at the ID telemedicine clinic by Dr. Gadea. (*Id.* at 21, 12/19/07 Entry.) At that time, he agreed to resume his HIV medications and take them as directed, and Dr. Gadea ordered them to be re-started. (*Id.*; *Id.* at 34, Physician's Orders.)

18

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

**I.      EXHAUSTION REQUIREMENT**

The Prison Litigation Reform Act ("PLRA") requires inmates to present their claims through an administrative grievance process before filing suit in federal court. Specifically, section 1997e(a) of Title 42 of the United States Code provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "'[I]t is beyond the power of this court- or any other- to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis.'" *Nyhuis v. Reno,* 204 F.3d 65, 73 (3d Cir. 2000) (quoting *Beeson v. Fishkill Corr. Facility,* 28 F. Supp. 2d 884, 894-95 (S.D.N.Y. 1998) (citing *Weinberger v. Salfi,* 422 U.S. 749, 766 (1975)). The PLRA "completely precludes a futility exception to its mandatory exhaustion requirement." *Nyhuis,* 204 F.3d at 71.  The PLRA also mandates that inmates "properly" exhaust administrative remedies before filing suit in

federal court.[5] *Woodford v. Ngo,* 548 U.S. 81, 92 (2006).

"Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91. Such requirements "eliminate unwarranted federal-court interference with the administration of prisons, and thus seek[ ] to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" *Id.* at 93 (quoting *Porter,* 534 U.S. at 525)). Failure to comply with procedural requirements of the applicable prison's grievance system will result in a procedural default of the claim. *Spruill v. Gillis,* 372 F.3d 218, 227-32 (3d Cir. 2004) ("[P]rison grievance procedures supply the yardstick for measuring procedural default.") A procedural default, "either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim." *Gallego v. United States,* Civil No. 1:02-CV-1157, 2005 WL 1653166, at \*2 (M.D. Pa. July 8, 2005).

---

[5]Because a plaintiff's failure to exhaust is an affirmative defense, a plaintiff is not required to allege in his complaint that he has exhausted administrative remedies. *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002). Rather, failure to exhaust must be pleaded and proven by the Defendants. *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002).

Defendants properly have raised the matter of exhaustion of administrative remedies made available to inmates confined in DOC custody. *See* DC-ADM 804, "Inmate Grievances (Doc. 80-15, Copy of DC-ADM 804.) DC-ADM 804 offers a three-phase review procedure. (*Id*. at 5-13.) An inmate who has a concern that he is unable to resolve may submit a grievance to the grievance coordinator within fifteen days of the date of the events giving rise to the grievance. (*Id.* at 5, DC-ADM 804, § VI A.) Within ten working days, the grievance coordinator transmits a decision to the inmate. (*Id.* at 7, DC-ADM 804, § VI. B. 7.)

If the inmate is dissatisfied with the disposition of the grievance, he may, within ten days of the grievance coordinator's decision, appeal to the Facility Manager/Superintendent, who must provide a decision within another ten working days. (*Id.* at 8, § VI. C. 1.)

Finally, an inmate may submit an appeal to the Secretary's Office of Inmate Grievances and Appeals within fifteen working days of the decision of the Facility Manager/Superintendent, and the Secretary's Office has thirty days in which to issue a decision. (*Id.* at 10-12 § V1. D. 1.)

## II.    STATEMENT OF FACTS RELATING TO EXHAUSTION

Documents pertaining to five (5) grievances filed by Crews during the

relevant time period have been filed in connection with the pending Motions. A review of these documents reveals that Crews only has exhausted his claim that Corrections Defendants were deliberately indifferent in violation of the Eighth Amendment in denying him medication. Crews raised this issue in the only grievance relating to the claims in the instant action that he fully exhausted: Grievance No. 195654.[6]

In that grievance, filed on August 1, 2007, Crews complained that he was denied medication because the officer accompanying the medication nurse told her not to give him medication unless he was wearing his jumpsuit and was at his cell door. (Doc. 80, Medical Dfts. SMF, ¶ 11; Doc. 106, Pltf. SMF, ¶ 11; Doc. 80-6, Grievance No. 195654, at 2.) Crews admitted in the grievance, and admits in his Statement of Material Facts responding to Medical Defendants' Statement, that he was not wearing his jumpsuit, and the officer instructed the nurse not to give him his medications. (Doc. 80 ¶ 11; Doc. 106 ¶ 11; Doc. 80-6 at 2.) Yet, Crews alleged that the guards were

_____

[6]In the other exhausted grievance, Grievance Number 197458, filed on August 16, 2007, Crews complained that Grievance Coordinator Ian Taggart violated the DOC employee code of ethics by failing to process Grievance No. 196848, which he described as raising issues of medical confidentiality involving Dr. Beaven. (Doc. 102 at 15-27.) Crews claims that Taggart failed to process the grievance out of retaliation for his having filed Grievance No. 195654. (*Id.*) Although the content of the grievances Taggart allegedly failed to process related to the claims presented in this case, Grievance No. 196848 itself was a complaint about the processing of his grievances. Therefore, the grievance, which ultimately was denied, does not relate to Crews' exhaustion of the claims presented in this action. (*Id.* at 15.)

using the jumpsuit as a pretext to justify not giving prisoners medication and that their denial of medication that was ordered by a doctor violates the law. (Doc. 80-6 at 2.) After the denial of this grievance by Teresa Law as frivolous and without merit, Crews fully exhausted his administrative remedies by filing appeals to Superintendent Kelchner and to the Secretary's Office of Inmate Appeals and Grievances, both of which were denied. (*See* Doc. 80-6 at 6, 7.)

In Grievance No. 196848, Crews claimed that he was retaliated against for filing grievances, and asserted his right to medical privacy, and specifically complained about Dr. Beaven breaching medical confidentiality; however, he did not fully exhaust this grievance. (*See* Doc. 8-7.) After Superintendent Kelchner denied his appeal, Crews did not file an appeal to final review with the Office of Inmate Grievances and Appeals. (*See id.*) In opposing Medical Defendants' Motion for Summary Judgment, Crews contends that he exhausted the issues in this grievance through Grievance No. 197458, which was fully exhausted. (*See* Doc. 106 ¶ 13 d.) However, the latter grievance, which is described in note six, *supra*, was a complaint about the processing of Crews' grievances, and thus does not relate to the claims presented in this lawsuit. (*See id.*)

In Grievance No. 206313, Crews complained that Dr. Gadea was denying him

medication that he needed for a serious medical condition. (Doc. 80-9 at 2.) Therefore, while it is true that Crews raised his complaint against Dr. Gadea prior to initiating this lawsuit, he did not fully exhaust it such that he is able to pursue his Eighth Amendment claim against Dr. Gadea in the instant action. In particular, the record shows that Crews initially filed an appeal for final review from Grievance No. 206313, but the appeal was rejected because the initial grievance and appeal to the Facility Manager were unreadable. (*See* Doc. 80-9 at 6.) Although Crews was given the opportunity to re-file his appeal within ten (10) days (*see id.*), the record shows that he did not do so. In opposing Medical Defendants' Motion, Crews claims that the fact that he submitted the necessary documentation for final review is sufficient for exhaustion even though the documents were rejected as unreadable. (*See* Doc. 106 ¶ 15 d.) Nevertheless, where Crews was advised that he needed to re-submit the documents in order for his appeal to be reviewed, and he failed to do so, it is clear that he failed to exhaust Grievance No. 206313, and therefore, he has failed to exhaust his Eighth Amendment claim against Dr. Gadea.

**MEDICAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Medical Defendants properly have raised the issue as to whether Plaintiff fully exhausted his administrative remedies with regard to his claims against them.

As detailed in the previous section, the record establishes that Crews has not fully exhausted his administrative remedies with respect to his claims against Medical Defendants.  While it is true that, in Grievance No. 195848 (*see* Doc. 80-7 at 2), Crews raised claims that Defendant Beaven loudly asked him why he was refusing his HIV medication and told him he should follow what the guards tell him to do if he wanted to live, and complained in Grievance No. 206313 (*see* Doc. 80-9 at 2), about Dr. Gadea stopping his medication, as set forth in note six, *supra*, Crews did not exhaust these claims.  Further, as set forth in the foregoing section, the claims in Grievance No. 195654 relate to the denial of medication by guards in the SMU, and the grievance makes no mention of Medical Defendants.  (*See* Doc. 80-6 at 2.)  Rather, Plaintiff raised his claims against Doctors Beaven and Gadea in Grievance Nos. 196848 and 206313 that were unexhausted.  Therefore, Plaintiff has failed to exhaust his Fourth Amendment violation of privacy claim against Dr. Beaven and his Eighth Amendment claim against Dr. Gadea, and these Defendants are entitled to judgment as a matter of law.

**CORRECTIONS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I.      EXHAUSTION**

Corrections Defendants properly have raised the issue as to whether Crews fully

exhausted his administrative remedies with regard to his claims against them.  As set forth, *supra*, it is apparent from the record that, through Grievance No. 195654, Crews exhausted his claim that Defendant Klepacz's denial of medication on July 31, 2007 violated the cruel and unusual punishment clause of the Eighth Amendment.  (*See* Doc. 80-6.)  Although that grievance only dealt with the denial of medication on July 31, 2007, we find that the fact that the denial of medications was raised as an issue is sufficient for the issue to have been exhausted as to the subsequent denials by Defendants Mains and Crozier.

Nevertheless, Crews has not exhausted his claim that the subsequent denials of medication by Defendants Klepacz, Mains, and Crozier were out of retaliation because he did not raise the issue of retaliation in the fully exhausted Grievance No. 195654. (*See id.*)  Rather, he did not raise the issue of retaliation until Grievance No. 196848, filed on August 9, 2007, which, as set forth in the foregoing section, was unexhausted. Therefore, Corrections Defendants are entitled to judgment as a matter of law as to Plaintiff's retaliation claim.  As such, the only exhausted claim for review on the merits is Plaintiff's deliberate indifference claim against Corrections Defendants.  We now turn to an analysis of that claim.

## II.     DELIBERATE INDIFFERENCE CLAIM

In order to establish an Eighth Amendment claim against a defendant for inadequate medical care, a plaintiff must show "(i) a serious medical need, and (ii) acts or omissions . . . that indicate deliberate indifference to that need." *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). *See also Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that a layperson would recognize the need for a doctor's attention. *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). In addition, "if 'unnecessary and wanton infliction of pain' results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).

The test for whether a prison official was deliberately indifferent is whether that defendant "acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 841. "The official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Thus, a complaint that a physician "has been negligent in diagnosing or treating a medical condition does not state a valid

claim of medical mistreatment under the Eighth Amendment . . . ." *Estelle*, 429 U.S. at

106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and

treatment of prisoners." *Durmer v. O'Carroll*, 991 F.2d 64, 67 (citations omitted.)

Furthermore, in the prison medical context, deliberate indifference generally is not

found when some significant level of medical care has been offered to an inmate.

*Clark v. Doe*, 2000 WL 1522855, at *2 (E.D. Pa. Oct 13, 2000) ("courts have

consistently rejected Eighth Amendment claims where an inmate has received some

level of medical care"). Courts will "disavow any attempt to second guess the

propriety or adequacy of a particular course of treatment . . . which remains a question

of sound professional judgment." *Little v. Lycoming County,* 912 F. Supp. 809, 815

(M.D. Pa. 1996) (quoting *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754,

762 (3d Cir. 1979)). Mere disagreement as to the proper medical treatment does not

support an Eighth Amendment claim. *Monmouth County Correctional Institutional*

*Inmates v. Lanzaro,* 834 F.2d 326, 346 (3d Cir. 1987) ("Courts, determining what

constitutes deliberate indifference, have consistently held that mere allegations of

malpractice do not raise issues of constitutional import . . . Nor does mere

disagreement as to the proper medical treatment support a claim of an eighth

amendment violation."); *White v. Napoleon,* 897 F.2d 103, 110 (3d Cir. 1990) (mere

28

disagreement over proper treatment does not state a claim upon which relief can be granted).

We begin by observing that the record establishes that the requirement that inmates be fully dressed to receive their medication clearly is an established policy in the SCI Camp Hill SMU, and that corrections officers at that institution had been advised via e-mail from the Nursing Supervisor of the importance of enforcing that policy and the fact that an inmate's failure to comply with it is considered a medication refusal. (*See* Doc. 85 at 8, Excerpt from SMU Inmate Handbook, ¶ 18; Doc. 85 at 9, Davis E-mail.) Although Crews claims that corrections officers deny medication to SMU inmates who are not wearing jumpsuits merely to "harass, demean, and humiliate" (*see* Doc. 102 ¶ 27), he has failed to dispute the existence of the policy as well as the valid security concerns behind it.

Having reviewed the record, we find that there is no genuine issue of material fact that Crews failed to comply with the SMU policy requiring him to have his jumpsuit on in order to receive medication, and that his refusal to put on his jumpsuit at the time of medication administration at the times relevant to this lawsuit constituted a medication refusal. Therefore, the Corrections Defendants were not deliberately indifferent to a serious medical need, particularly where they ordered Crews to get

dressed so that he would receive his medication; rather, the sole reason that Crews did not receive his medication was because he chose to refuse it.[7]

Our finding is supported by the fact that Crews has admitted in more than one instance that he was not wearing his jumpsuit at the relevant times, as well as his failure to show otherwise in opposing the instant Motions.  With regard to the former point, although Crews testified during his deposition that he always had his jumpsuit on (*see* Doc. 80-12 at 18, lines 20-22), he admitted in Grievance No. 195654, and admits in his Statement of Material Facts responding to Medical Defendants' Statement, that he was ***not*** wearing his jumpsuit on July 31, 2007, and the officer instructed the nurse not to give him his medications.  (Doc. 80-6, Grievance No. 195654, at 2; Doc. 106, Pltf. SMF Responding to Medical Dfts. SMF, ¶ 11.)

In addition, the following statement of fact by Plaintiff amounts to an admission that he was not wearing his jumpsuit: "Corrections Defendants refused Plaintiff his medication for non-medical reason claiming that he did not have his jumpsuit on in

---

[7]In disposing of Plaintiff's deliberate indifference claim, it bears noting that the record establishes that SCI Camp Hill staff did not just allow Plaintiff to refuse medication without any further action.  Rather, as outlined herein, Plaintiff's medical records reflect that he was advised of the potential serious consequences of his refusal and that doctors were informed of his refusal.  The medical records also show that the medical staff followed up in an effort to convince Plaintiff to cooperate so that he would receive his medication and also treated and monitored him even when he strongly resisted their efforts, including by spitting at medical staff.  The follow-up that is apparent from these records further supports a finding of an absence of evidence showing deliberate indifference to Plaintiff's health.

violation of Department of Corrections Policy and for violating this policy he was punished by Corrections Defendants refusal to let medication nurse give him his medication for HIV. Medication was used for punishment." (Doc. 102, Pltf. SMF, ¶ 12.) In that statement, Plaintiff both admits he did not have his jumpsuit on and that he violated the policy requiring him to have it on to receive medication.

Further, Crews' admission in the following statement of fact that he became verbally abusive when the policy requiring inmates to wear a jumpsuit was enforced amounts to an admission that he violated the policy: "Practice of Corrections defendants rewarding prisoner with medication etc. if they have on jumpsuit and punish them by refusing them medication etc. if they do not have on jumpsuit was done for the sole purpose to harass, demean, humiliate and *to provoke prisoners such as Plaintiff to act out (become loud & verbally abusive)*." (*Id.* ¶ 27.)

In addition, Plaintiff's attempt to show through affidavits of fellow inmates that there is a genuine issue of material fact as to whether he was wearing a jumpsuit at the relevant times was unsuccessful. In their affidavits, Inmates Keys and Martin merely mimic the allegations of Plaintiff's Complaint, and claim that they overheard Plaintiff being denied medication at the relevant times, but fail to state whether Plaintiff was or was not wearing his jumpsuit at the time of medication administration. (Doc. 102 at 5-

6, Keys Decl.; Doc. 102 at 8, Martin Decl.)  As such, the affidavits fail to controvert the evidence in the record that Plaintiff was denied medication because he was not wearing his jumpsuit.

Based on the foregoing, we conclude that there is no genuine issue of material fact that, at the times relevant to this lawsuit, Crews was not wearing his jumpsuit, and therefore Corrections Defendants were following the established SMU policy of requiring inmates to be fully dressed at the time of medication administration, and properly treating the situation as a medication refusal when Crews refused to obey orders to get dressed.  Therefore, Corrections Defendants were not deliberately indifferent to Crews' serious medical needs and are entitled to judgment as a matter of law.

**CONCLUSION**

For the foregoing reasons, Defendants' Motions for Summary Judgment (Docs. 79, 82) will be granted, judgment will be entered in their favor, and the Clerk of Court will be directed to mark this case closed.